UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

MARSHALL TYRONE BROUGHTON,

                 Petitioner,

        -against-

WILLIAM CONNOLLY, Superintendent,
Fishkill Correctional Facility,

                 Respondent.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: **5/29/13**

**REPORT AND
RECOMMENDATION**

08 Civ. 8378 (ER) (GAY)

TO THE HONORABLE EDGARDO RAMOS, United States District Judge:

    On December 4, 2003, a Westchester County jury convicted petitioner Marshall Tyrone Broughton ("petitioner" or "defendant") of first degree sodomy.  Petitioner's conviction stemmed from an incident involving petitioner and his acquaintance, Aurora Lopez, on March 15, 2003 in Mount Vernon, New York.[1]  On August 3, 2003, the trial court sentenced petitioner as a second felony offender to nine years imprisonment, followed by five years of post-release supervision.  On or about August 11, 2011, petitioner was released on parole from Mohawk Correctional Facility.[2]

    Presently before this Court is petitioner's *pro se* Petition for a Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, I respectfully recommend that the Court deny the petition in its entirety.

---

    [1] The jury acquitted petitioner of two counts of sodomy (counts one and three), first degree sexual abuse (count four) and unlawful imprisonment (count five).

    [2] Petitioner failed to notify the Court of either his transfer from Fishkill Correctional Facility or his release.  Nor has he provided the Court with any contact information since.

Copies mailed / ~~handed~~ / ~~faxed~~ to ~~counsel~~ Plaintiff 5 / 29 / 13

## I. PROCEDURAL HISTORY

After the jury was dismissed, defense counsel made an oral application to set aside the verdict as inconsistent and against the weight of the evidence, on the grounds that the jury (1) could not have found petitioner guilty of one count of sodomy while acquitting him of the other two counts and (2) could not have convicted petitioner of first degree sodomy while acquitting him of first degree sexual abuse and unlawful imprisonment (T. 1199-1201).[3]  The trial court denied petitioner's application on the grounds that (1) there was evidence which supported the conviction and credibility determinations are left to the jury and (2) the counts of "sex abuse 1 and unlawful imprisonment 2 are not lesser included of sodomy 1 . . . The jury well could have found that by slapping the victim and pulling her hair to the extent that she stated it happened, that's forcible compulsion" (T. 1202-03).

On or about February 8, 2004, defense counsel filed a motion to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") section 330.30 on the following grounds: (1) juror misconduct; (2) the verdict–convicting of sodomy but acquitting of unlawful imprisonment–was inconsistent and repugnant; (3) the evidence was insufficient as a matter of law because of the lack of DNA evidence and the exclusion of a favorable polygraph, both of which demonstrated petitioner's innocence. See Memorandum of Law and Respondent's Appendix, Exhibit 3.[4]  As to his claims of

_____

[3] Numbers in parentheses preceded by "T." refer to pages from the trial transcript.

[4] Hereinafter, all citations to "Exh. ___" refer to exhibits in Respondent's Appendix attached to Respondent's Memorandum of Law.

juror misconduct, petitioner alleged that Juror White failed to disclose her employment and address to the Court, and failed to reveal during jury selection "that she was addicted to drugs or that she was currently enrolled in a methadone treatment program where she was receiving regular doses of psychoactive medications.  She failed to reveal that during the jury selection, trial and deliberation phases of the case, she was taking mind-altering substances."  See id. at 7.[5]  On or about April 12, 2004, defense counsel filed a supplemental affirmation and memoranda wherein he added a claim that Juror White failed to disclose that she had a prior felony conviction.  See Exh. 4.  By Decision and Order entered May 4, 2004, the Westchester County Supreme Court (Smith, J.) ordered a hearing on the question of whether Juror White had failed to disclose a prior felony conviction, and denied petitioner's motion to set aside the verdict in all other respects.  See Exh. 7.

Juror White was examined at a hearing held on May 18, 2004.  See Exh. 8.  At the start of the hearing, petitioner advised the court of his additional contention that Juror White had also failed to disclose that she recognized petitioner from the streets of Mount Vernon.  See id. at 3-4.  The court heard evidence on that claim as well.

Juror White testified that she had been convicted of criminal mischief (in 1984) and petit larceny (in 1989), but maintained that she was unaware that either conviction was a felony.  See id. at 8-9, 12, 22, 28-29.  She could not recall any questions on voir dire about her criminal record, and testified that if she indicated on the juror

_____

[5] Although petitioner's CPL 330.30 motion also contained allegations of misconduct on the part of Juror Susa, said allegations are not relevant to the instant petition.

questionnaire that she had never been convicted of a felony, it was because she believed–and still believes–that she did not have a felony conviction.  See id. at 10-12, 22, 28-29.

Juror White acknowledged that she had seen petitioner on the streets around Mount Vernon, but testified that she did not know him and had never spoken to him. See id. at 14-15, 23-24.  She did not recall being questioned as to whether she had ever seen petitioner before and, in any event, did not recognize him until after she had been selected as a juror.  See id. at 17, 24-25.  In response to defense counsel's questioning, Juror White denied ever having seen petitioner engaged in drug-related activity and stated she had no reason to believe petitioner was engaged in any illegal activity on the occasions she observed him.  See id. at 15-17.  She did not disclose to her fellow jurors that she recognized petitioner from the streets of Mount Vernon.  See id. at 23-24. Juror White testified that the fact that she had seen petitioner a few times on the street prior to the case had no bearing on her deliberations, that she took her role as juror very seriously, she listened with an open mind and remained fair and impartial.  See id. at 19-20, 24.

By Decision and Order dated July 22, 2004, the court denied petitioner's motion to vacate on the grounds that Juror White's testimony did "not disclose any failure 'to answer honestly a material question on voir dire'" and there was "no suggestion from any of Ms. White's testimony[ ] that her prior convictions and viewings of the defendant created a 'substantial risk of prejudice.'" See Exh. 10 (citations omitted).

Petitioner, by and through counsel, timely appealed the judgment of conviction to the Appellate Division, Second Department, on the grounds that: (1) petitioner was

deprived of due process of law because the conviction was not supported by sufficient evidence and was against the weight of the evidence; (2) petitioner was deprived of due process because his conviction on the count of first degree sodomy and acquittal on the unlawful imprisonment charge was inconsistent and repugnant; (3) the trial court erroneously denied petitioner's motion to vacate because he was acquitted of unlawful imprisonment "and therefore should not have been found guilty of any charges which were part of the 'unitary theory' presented by the People;"[6] (4) the trial court improperly instructed the jury to decide whether there was evidence adduced that the vehicle was moving during the commission of the sodomy (i.e. whether petitioner was actually driving when the sodomy occurred);[7] (5) because counts two (sodomy) and five (unlawful imprisonment) were "duplicitous" and because petitioner was acquitted of unlawful imprisonment, his sodomy conviction must be dismissed;[8] (6) the trial court erred and abused its discretion when it denied petitioner's motion to set aside the verdict on the grounds that Juror White failed to reveal that she had a felony conviction and that she had seen petitioner on a few occasions in Mount Vernon; and (7) petitioner's sentence was excessive and the Order of Protection should be reversed.

---

[6] Petitioner's additional allegation--that the trial court improperly allowed testimony regarding an uncharged "forcible kiss"–is not relevant to the instant petition.

[7] Petitioner argued that the evidence adduced at trial regarding the second alleged incident of sodomy differed from the evidence before the grand jury which changed the theory of prosecution and, by allowing the jury to decide the issue of petitioner's operation of the motor vehicle as a factual matter, the trial court improperly effectuated a mid-trial amendment to the People's bill of particulars and wrongfully delegated its discretion to the jury.

[8] The Court assumes that petitioner meant to argue that the counts were "duplicative."

See Brief of Defendant-Appellant, Exh. 11, at 46-72.  The Second Department, by
Decision and Order dated May 22, 2007, affirmed the judgment of conviction.  See
People v. Broughton, 40 A.D.3d 1007, 834 N.Y.S.2d 868 (2d Dep't 2007).  The New
York Court of Appeals denied petitioner leave to appeal on September 12, 2007.  See
People v. Broughton, 9 N.Y.3d 921, 875 N.E.2d 895, 844 N.Y.S.2d 176 (2007).

On or about September 4, 2008, petitioner timely filed the instant Petition for a
Writ of Habeas Corpus, wherein he asserts the following grounds for habeas relief: (1)
he was deprived of a fair trial because Juror White failed to disclose during voir dire that
she had been convicted of a felony and knew petitioner and, during the course of jury
selection and trial, she was suffering from crack addiction, enrolled in a methadone
program and under the influence of intoxicating substances; (2) the verdict was
inconsistent because he was convicted of only one count of sodomy and acquitted on
all other counts; (3) the trial court erred in allowing a mid-trial amendment to the
prosecution's bill of particulars when it improperly instructed the jury to decide whether
there was evidence adduced that petitioner was driving the vehicle when the alleged
sodomy occurred; and (4) his conviction was against the weight of the evidence and
was not supported by sufficient evidence.

## II.  STANDARD OF REVIEW

"[I]t is not the province of a federal habeas court to reexamine state-court
determinations on state-law questions.  In conducting habeas review, a federal court is
limited to deciding whether a conviction violated the Constitution, laws, or treaties of the
United States."  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  See 28 U.S.C. § 2254(a).
Subsequent to the enactment of the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which amended 28 U.S.C. § 2254, a federal court may not grant habeas relief for any claim adjudicated on the merits in state court unless the petitioner establishes, in pertinent part, that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

A state court's decision is "contrary to" clearly established Federal law if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme Court of the United States] on a question of law" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court of the United States]."  See Williams v. Taylor, 529 U.S. 362, 405 (2000).  As to the "unreasonable application" prong, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  See id. at 411.  A state court decision involves an "unreasonable application" of Federal Supreme Court precedent if (1) "the state court identifies the correct legal rule from [Federal Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or (2) "the state court either unreasonably extends a legal principle from [Federal Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  See id. at 407.  However, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  See

-7-

Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (citation omitted).  In other words, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 786-87.

Finally, under the AEDPA, the factual findings of state courts are presumed to be correct.  See 28 U.S.C. §2254(e)(1); see also Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997).  The petitioner must rebut this presumption by "clear and convincing evidence."  See 28 U.S.C. §2254(e)(1).

## III.  NON-COGNIZABLE CLAIMS

### A.  Verdict Against Weight of the Evidence

As part of his fourth ground for habeas relief, petitioner alleges that his conviction was against the weight of the evidence.  A challenge to a verdict based on the weight of the evidence is not cognizable on federal habeas review.  See McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 Fed. App'x 69, 75 (2d Cir. 2011).  A "weight of the evidence" claim is grounded in New York Criminal Procedure Law, pursuant to which a New York appellate court may reverse or modify a conviction upon "a determination that a verdict of conviction resulting a judgment was, in whole or in part, against the weight of the evidence."  See N.Y. Crim. Proc. Law §470.15(5); People v. Bleakley, 69 N.Y.2d 490, 495, 508 N.E.2d 672, 515 N.Y.S.2d 761 (1987) (weight of the evidence claim is based on court's factual review power).  Because petitioner's weight of the evidence claim implicates only state law, it is not cognizable in this federal habeas proceeding.  See 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 68.  Accordingly, I

-8-

respectfully recommend that petitioner's weight of the evidence claim must be dismissed.

    B. <u>Inconsistent Verdict</u>

    As his second ground for habeas relief, petitioner contends that he was deprived of due process because he was convicted of only one count of sodomy and acquitted on all other counts and, therefore, the verdict was inconsistent.  "[W]here truly inconsistent verdicts have been reached, the most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. . . . It is equally possible that the jury, convinced of guilt, properly reached its conclusion . . . then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [other] offense.  <u>United States v. Powell</u>, 469 U.S. 57, 64-65 (1984).  Thus, it is well-settled that inconsistent jury verdicts are not a ground for federal habeas relief.  <u>See</u>, <u>e.g.</u>, <u>Dowling v. United States</u>, 493 U.S. 342, 353-54 (1990) (stating that "inconsistent verdicts are constitutionally tolerable"); <u>Harris v. Rivera</u>, 454 U.S. 339, 345 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside."); <u>Suarez v. Bennett</u>, 207 F. App'x 114, 116 (2d Cir. 2006) ("[W]e are not permitted to grant habeas simply because a jury's verdicts are inconsistent."); <u>United States v. Acosta</u>, 17 F.3d 538, 545 (2d Cir.1994) ("[I]t has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty.").  Accordingly, I respectfully recommend that petitioner's inconsistent verdict claim must be dismissed because it is not cognizable on habeas

review.[9]

## IV. PROCEDURAL DEFAULT

Federal habeas corpus review of a state court's denial of a state prisoner's federal constitutional claim is barred if the state court's decision rests on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional violation, or show "that failure to consider the claims will result in a fundamental miscarriage of justice." See Coleman v. Thompson, 501 U.S. 722, 750 (1991). See also Lee v. Kemna, 534 U.S. 362, 375 (2002). Where a state court has expressly relied on a procedural default, federal habeas review is foreclosed even if the state court also addressed the merits of the federal claim. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

A procedural bar is "adequate" if it is "based on a rule that is firmly established and regularly followed by the state in question." Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006) (internal quotation and citation omitted). In certain limited circumstances, however, "even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" See Garvey v. Duncan, 485 F.3d 709, 713-14 (2d Cir. 2007)(citing Lee, 534 U.S. at 376). To this end, the Second Circuit has set forth the following "guideposts" for evaluating the adequacy of the state procedural bar in the context of "the specific circumstances presented in the case, an inquiry that includes an evaluation of the

---

[9] Because petitioner's inconsistent verdict claim is clearly non-cognizable, I need not address the issue of whether it is procedurally barred.

-10-

asserted state interest in applying the procedural rule in such circumstances":

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

See Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003)(quoting Lee, 534 U.S. at 381-85).

### A. Third Habeas Claim:  Erroneous Jury Charge

During deliberations, the jury requested read-back of the victim's testimony concerning events germane to the second alleged sodomy (for which petitioner was convicted) (T. 1187).  The stenographer located the relevant passages and read them to the jury (T. 1188).  The jury resumed deliberations and the parties recessed for lunch (T. 1188).   After the lunch break, defense counsel questioned whether testimony was missing from the read-back on the issue of whether the vehicle was moving at the time of the second alleged sodomy (T. 1188-89).  Counsel reviewed the transcript but were unable to locate the passage defense counsel thought was missing (1189).  Nonetheless, based upon their belief that testimony had been adduced on the issue of whether petitioner was driving during the second alleged sodomy, both parties agreed that the jury should be instructed that it was up to them whether they recalled said testimony (T. 1190-93).  The trial court thus instructed the jury as follows (T. 1194-95):

> Another issue came up, and this I'm going to leave for your recollection.  Defense counsel recalls and Ms. Lopez herself is not certain but thinks might have happened that there was some testimony on cross-examination by [Ms. Lopez] as to the second alleged incident of sodomy and something to the effect that while this alleged sodomy was occurring,

that the car was in motion, that they were driving.

We cannot find that passage and we decided after discussing it that we're going to leave that up to your recollection. If you don't remember it, fine. If you do remember it, fine, but it's not in the record. However, both Counsel referred to it in their closing arguments, and for that reason, I am addressing it in this manner.

As his third ground for habeas relief, petitioner alleges that he was deprived of due process because the trial court improperly instructed the jury to decide whether there was evidence adduced that petitioner was driving the vehicle when the alleged sodomy occurred. Petitioner presented this argument to the Second Department in Point Four of his brief on direct appeal; the Second Department expressly stated that said claim was "unpreserved for appellate review" pursuant to CPL 470.05(2). See People v. Broughton, 40 A.D.3d 1007, 834 N.Y.S.2d 868.

New York's contemporaneous objection rule (codified at section 470.05(2) of New York's Criminal Procedure Law) "provides that, with a few exceptions not applicable here, New York appellate courts will review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them during criminal proceedings." See Downs v. Lape, 657 F.3d 97, 103 (2d Cir. 2011). The Second Circuit has consistently recognized New York's contemporaneous objection rule as an independent and adequate state procedural rule barring habeas review. See, e.g., Whitley v. Ercole, 642 F.3d 278, 292 (2d Cir. 2011); Brown v. Ercole, 353 Fed. App'x 518, 520 (2d Cir. 2009); Richardson v. Greene, 497 F.3d 212, 218 (2d Cir. 2007); Garvey, 485 F.3d at 718; Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999) (federal courts "have observed and deferred to New York's consistent application of its contemporaneous objection rules").

Further, the Appellate Division's application of CPL 470.05(2) in this case was not exorbitant. As to the first *Cotto* consideration, it is "meaningless to ask whether the alleged procedural violation was actually relied on in the trial court–the violation only first occurred when defendant raised an argument on appeal that he had not raised earlier." See Garvey, 485 F.3d at 719. Indeed, compliance with CPL 470.05 would have given the trial court an opportunity to reconsider the jury charge in question. The second *Cotto* consideration also weighs against petitioner because this case presents none of the "unique circumstances" that made compliance difficult in *Lee* and *Cotto*. The third *Cotto* consideration similarly disfavors petitioner because, just as in *Garvey*, petitioner did not simply violate the "formal requirements" of CPL 470.05(2), but rather "the very essence" of the rule. See id. at 720. Moreover, petitioner's compliance would have served a legitimate purpose in that "[a]t a bare minimum, the trial court could have developed a factual record supporting its decision that could then properly be reviewed on appeal." See Whitley, 642 F.3d at 290.

Because there is an adequate and independent finding by the Appellate Division that petitioner procedurally defaulted on the jury charge claim he now asserts as grounds for habeas relief, petitioner must demonstrate in his habeas petition "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." See Coleman, 501 U.S. at 750. Petitioner, however, has made no attempt to show cause or prejudice, and there is no indication that this Court's failure to address the merits of the unpreserved claim would result in a fundamental miscarriage of justice. Accordingly, I conclude, and respectfully recommend, that petitioner's procedural

-13-

default bars federal review of his third claim for habeas relief.[10]

## V.  JUROR MISCONDUCT CLAIM

In his first claim for habeas relief, petitioner contends he was deprived of his Sixth Amendment right to a fair trial because Juror White (1) failed to disclose during voir dire that she had been convicted of a felony and knew petitioner, (2) lied during voir dire about her residence and place of business and (3) during the course of jury selection and trial, she was suffering from crack addiction, enrolled in a methadone program and under the influence of intoxicating substances.  Petitioner raised the same allegations of juror misconduct in his CPL 330.30 motion; on direct appeal, however, his complaints about Juror White were limited to her failure to reveal that she had a felony conviction and that she had seen petitioner on a few occasions in Mount Vernon.  The Appellate Division found said claims to be "without merit."  See People v. Broughton, 40 A.D.3d 1007, 834 N.Y.S.2d 868.

A.  Allegations of Juror Misconduct Raised on Direct Appeal

"One touchstone of a fair trial is an impartial trier of fact–a jury capable and willing to decide the case solely on the evidence before it."  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984).  Where a petitioner alleges juror bias based upon a juror's failure to respond accurately to a question posed on voir dire, a new trial is warranted if petitioner demonstrates (1) that the juror "failed to answer honestly a material question on voir dire" and (2) "that a correct response would have

_____

[10] Dismissal of claim for habeas relief on the ground of procedural default amounts to "a disposition of the habeas claim on the merits."  See Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011).

-14-

provided a valid basis for a challenge for cause." See id. at 556.  See also United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006) (applying *McDonough* in a criminal case).  In order to satisfy the first prong, petitioner must demonstrate that a juror *deliberately* gave a false answer during voir dire.  See United States v. Shaoul, 41 F.3d 811, 815–16 (2d Cir. 1994) (A "juror's good faith failure to respond, though mistaken, [does] not satisfy . . . the first prong of the [*McDonough*] test.").  See also McDonough, 464 U.S. 555-56 ("To invalidate the result of a [ ] trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.").

By Decision and Order dated July 22, 2004, the trial court denied petitioner's motion to vacate on the grounds that Juror White's testimony did "not disclose any failure 'to answer honestly a material question on voir dire'" and there was "no suggestion from any of Ms. White's testimony[ ] that her prior convictions and viewings of the defendant created a 'substantial risk of prejudice.'" See Exh. 10 (citations omitted).  A trial court's determination of whether a juror's impartiality has been compromised is a factual determination that is entitled to a presumption of correctness. See 28 U.S.C. §2254(e)(1);  Wainwright v. Witt, 469 U.S. 412, 428 (1985) (A finding of juror bias is "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province."); Patton v. Yount, 467 U.S. 1025, 1035-37 (1984) ("A court's determination that a juror is capable of rendering an impartial verdict is a factual determination involving credibility, and therefore is granted particular deference."); Arizona v. Washington, 434 U.S. 497, 513-14 (1978) (determining that a federal court on habeas review must accord deference to a state trial judge's evaluation of juror bias).

-15-

Thus, the trial court's determination that Juror White was honest and impartial is presumed to be correct; petitioner proffers no evidence to rebut said presumption. Further, petitioner fails to establish that the decision by the trial court–and by extension the Appellate Division–that petitioner's right to a fair trial by an impartial jury was not violated was either contrary to, or involved an unreasonable application of, clearly established Federal law.  Accordingly, I conclude, and respectfully recommend, that the allegations of juror misconduct petitioner raised on direct appeal are without merit and do not provide a basis for habeas relief.

    B.  <u>Unexhausted Allegations of Juror Misconduct</u>

    "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State . . . ."  28 U.S.C. § 2254(b)(1).  A habeas petitioner satisfies the exhaustion requirement if he has presented his claims for post-conviction relief to the highest state court.  <u>See</u> <u>Humphrey v. Cady</u>, 405 U.S. 504, 516 (1972); <u>Grey v. Hoke</u>, 933 F.2d 117, 119 (2d Cir. 1991). More specifically, "[t]he exhaustion requirement may be satisfied by raising the federal claim on direct appeal to the state's highest court or by collateral attack of the conviction and subsequent appeal of the denial of that application to the state's highest court." <u>Harris v. Hollins</u>, No. 95 Civ. 4376, 1997 WL 5909, at *2 (S.D.N.Y. Jan. 7, 1997). Further, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (citation omitted).  To properly exhaust a state court remedy, a petitioner "must apprise the highest state court of both the factual

-16-

and the legal premises of the federal claims ultimately asserted in the habeas petition."
See Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005).  This requires the petitioner to
have set forth in state court "all of the essential factual allegations asserted in his
federal petition," coupled with "essentially the same legal doctrine he asserts in his
federal petition."  Daye v. Attorney Gen. of New York, 696 F.2d 186, 191-92 (2d Cir.
1982) (en banc).  To this end, the Second Circuit has delineated a number of ways in
which a petitioner may fairly apprise the state court of the constitutional nature of his
claim, including: "a) reliance on pertinent federal cases employing constitutional
analysis, b) reliance on state cases employing constitutional analysis in like fact
situations, c) assertion of the claim in terms so particular as to call to mind a specific
right protected by the Constitution, and d) allegation of a pattern of facts that is well
within the mainstream of constitutional litigation."  See Carvajal v. Artus, 633 F.3d 95,
104 (2d Cir. 2011).

Here, on direct appeal, petitioner argued juror misconduct only on the grounds
that Juror White failed to disclose during voir dire that she had been convicted of a
felony and knew petitioner.  The remainder of the allegations of juror misconduct
asserted in the instant Petition–that Juror White failed to disclose her employment and
address to the Court and, during the course of jury selection and trial, she was suffering
from crack addiction, enrolled in a methadone program and under the influence of
intoxicating substances–were not raised on direct appeal.  Accordingly, I conclude, and
respectfully recommend, that the remainder of petitioner's allegations of juror
misconduct are unexhausted.

Nevertheless, said allegations are "deemed exhausted" since petitioner no longer

has remedies available in the state courts.  See Bossett v. Walker, 41 F.3d 825, 828 (2d

Cir. 1994).  Petitioner cannot again seek leave to appeal his claims in the Appellate

Division or Court of Appeals because he has already made the one request for leave to

appeal to which he is entitled.  See N.Y. Ct. Rules § 500.20(a); N.Y. Crim. Proc. Law §

460.15.  Further, petitioner is precluded from raising his claims in a collateral

proceeding because he could have presented them on direct appeal but did not.  See

N.Y. Crim. Proc. Law § 440.10(2)(c).

Although the remainder of petitioner's allegations of juror misconduct are

deemed exhausted, petitioner's forfeiture of said claims in state court "bars him from

litigating the merits of those claims in federal habeas proceedings, absent a showing of

cause for the procedural default and prejudice resulting therefrom."  See Grey, 933 F.2d

at 121.  Alternatively, said claims–while otherwise procedurally barred–may receive

federal habeas review if petitioner shows that the failure to consider the claims will

result in a fundamental miscarriage of justice because "a constitutional violation has

probably resulted in the conviction of one who is actually innocent."  Murray v. Carrier,

477 U.S. 478, 496 (1986).  Here, however, petitioner does not allege cause or prejudice

for his procedural default, nor does he allege that this Court's failure to address the

merits of said claims would result in a fundamental miscarriage of justice.  Accordingly, I

respectfully recommend that the remainder of petitioner's allegations of juror

misconduct are procedurally barred from consideration by this Court and must be

dismissed.

## VI.  SUFFICIENCY OF THE EVIDENCE

Petitioner was charged with five crimes under a single indictment and was

-18-

convicted of one count of first degree sodomy (Count 2). Specifically, the jury found petitioner guilty of forcing the victim's mouth onto his penis while he and the victim were in a car on March 15, 2003. In his fourth claim for habeas relief, petitioner argues (as he did on direct appeal) that the evidence was insufficient to support his conviction. The Appellate Division rejected said claim on the merits, to wit: "Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish defendant's guilt beyond a reasonable doubt." See People v. Broughton, 40 A.D.3d 1007, 834 N.Y.S.2d 868 (citation omitted).

A petitioner challenging the sufficiency of the evidence underlying his conviction "bears a heavy burden." See United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009). Courts will not disturb a jury's verdict "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See United States v. Farhane, 643 F.3d 127, 144 (2d Cir. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original). A habeas court applying said standard must assess the evidence adduced at trial in the light most favorable to the prosecution. See Fama v. Commissioner of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000). Habeas courts must also defer to the jury's assessments of the weight of the evidence and credibility of the witnesses. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996). In sum, factoring in the deferential AEDPA standard of review, "where the state courts have denied a claim of insufficient evidence on the merits, we may not grant the writ unless we conclude that *no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." See Garbutt v. Conway, 668 F.3d 79, 81-82 (2d Cir. 2012). "State law determines the

elements of a crime that must be supported by sufficient evidence to satisfy

constitutional due process."  Policano v. Herbert, 507 F.3d 111, 115-16 (2d Cir. 2007).

New York Penal Law §130.50 defines sodomy in the first degree, in relevant part,

as "engag[ing] in oral sexual conduct . . . with another person . . . [b]y forcible

compulsion."  The trial court charged the jury as to the elements of first degree sodomy

(T. 1143-45) without objection (T. 1155).  The jury was instructed that, in order to find

petitioner guilty of first degree sodomy, they had to find that the People proved beyond

a reasonable doubt that petitioner engaged in deviate sexual intercourse with the victim

(specifically, contact between her mouth and his penis) and that he did so without the

victim's consent by use of forcible compulsion (defined as "to intentionally compel by the

use of physical force") (T. 1143-44).  The jury was further instructed that there were

three counts of sodomy involving three separate incidents (T. 1145), and that they were

to consider the evidence applicable to each crime separately and return a separate

verdict on each crime based only on the evidence applicable to the crime they were

considering (T. 1122-23).

The following testimony was elicited from the victim (Aurora Lopez) at trial:

In 2003, Aurora Lopez was a twenty-five year old single mother with a bachelor's

degree in Communications, who marketed the "Nickelodeon" brand of clothing as an

"apparel coordinator" for MTV Networks (T. 426-28, 544-45).[11]  She also did freelance

party promotions at clubs, and she and two colleagues were in the process of starting

---

[11] At the time of trial, Lopez was employed by Cerebral Palsy of New Jersey where she worked one-on-one with autistic children in a home-based early intervention program (T. 545-47).

their own party promotion business (T. 428, 542-44).

On March 1, 2003, Lopez and her cousin went to Sue's Rendezvous, a men's strip club, to hear a disc jockey from a favorite radio station (T. 429). They left after about forty-five minutes and walked back to their car, but police activity prevented access to their vehicle (T. 430-32, 466-67). While they waited for the police activity to clear, petitioner approached them and introduced himself as "B.I." (T. 431, 539). Lopez and her cousin talked with petitioner for awhile, mostly about party promotion and bartending (T. 431, 541-42). Petitioner told the women he had thrown a party that evening at the club next door ("Colosseo DiRoma"), and took them into the club to show them around and introduce them to the bartender (T. 431, 433, 542). Petitioner and the two women talked about fifteen or twenty minutes and made tentative plans to meet the following evening (T. 432, 433, 540). After the police activity cleared, the women agreed to give petitioner a ride to his car (T. 433). When they dropped petitioner at his car, both women gave him their telephone number; Lopez did so in order that petitioner could contact her regarding possible business ventures (T. 434, 560).

Petitioner called Lopez the next day but she let it go to voicemail (T. 434). Petitioner left a message asking whether the three of them were still meeting that evening (T. 435). Because her cousin could not go, Lopez called petitioner and told him "maybe another time" (T. 435). During the next two weeks, Lopez and petitioner spoke on the phone several times about potential business opportunities–promotion ideas and venue locations in Mt. Vernon, New Rochelle and Manhattan (T. 436-37, 768).

On March 14, 2003, after a particularly "hectic and stressful" day, petitioner remembered she needed to give petitioner some information about venues they had

-21-

agreed to scout, and called him (T. 438, 561, 567).  The conversation began as a

business call but turned personal when petitioner asked if something was wrong (T.

439, 563).  Lopez told him about her problems at work; petitioner insisted he could

cheer her up and begged Lopez to let him take her out (T. 439-440).  She initially

declined but eventually gave in and agreed to meet him at 8:00 p.m. that evening (T.

440, 536).

     At approximately 5:30 p.m., having some doubts about meeting petitioner, Lopez

called him and offered various excuses to try and avoid meeting him (T. 441).  Petitioner

insisted; Lopez again relented and agreed to meet him for dinner at 9:00 p.m. at

Jimmy's Bronx Café (T. 441-42).  Lopez was still at home at 9:00 p.m and not ready to

go out, so she called petitioner to postpone (T. 443).  Petitioner said he thought Lopez

was on her way; Lopez said no, she was not dressed and didn't know what to wear (T.

443).  Petitioner suggested Lopez wear "something nice, something sexy, we're going

to be going to clubs" (T. 443).  Lopez said she would call him when she left (T. 443).

     At approximately 10:50 p.m., Lopez finally began driving her car to Jimmy's (T.

443).  She called petitioner to tell him she was on her way and petitioner told her,

because she took so long, he was no longer at Jimmy's and she would have to meet

him at "the studio" (T. 443).  Lopez questioned petitioner about the mixup; petitioner told

her to "calm down" and gave her directions to "the studio" (T. 444).  Lopez followed

petitioner's directions and arrived at the Cross County Mall, where she found a deserted

parking lot, darkened storefronts and no "studio" in sight (T. 444).  She called petitioner;

petitioner said he would be there in ten minutes (T. 445).  It was now about 11:30 p.m.

(T. 445).  Lopez waited and, after about ten minutes, petitioner pulled his car up next to

hers (T. 445-46).  They got out of their vehicles and, at petitioner's urging, Lopez gave him a hug (T. 446).  Petitioner, who was a "large man" (T. 431, 539), was wearing a velour sweat suit with draw string pants and a zippered jacket (T. 448-49, 539, 609). They got back into their respective cars; Lopez agreed to take one car but stated she wanted to take her car (T. 446-47).  Lopez followed petitioner to his house; he parked his car  and, approaching Lopez's car, told her to "move over" and insisted on driving (T. 447-48).  Petitioner did not have to adjust the driver's seat, which was already pushed back as far as it could go, and there was a gap of approximately six to seven inches between the steering wheel and his belly (T. 505-06, 612).

Petitioner brought a bag of alcohol into Lopez's car and Lopez told him "I don't know why you have it, I'm not drinking" (T. 449-50, 622).  While still parked across from his house, petitioner emptied two juice bottles, mixed Hypnotic and Hennessy in one bottle for Lopez (an "Incredible Hulk") and poured straight Hennessy in the other bottle for himself (T. 447, 449-50, 622-23).  Petitioner tried to cajole Lopez into tasting the drink but she refused, and again advised petitioner that she was not drinking (T. 449, 623).

Petitioner drove to "Club Westchester" in New Rochelle, where he purportedly needed to speak to one of the managers (T. 448, 454).  On the way, petitioner intentionally drove erratically, at times swerving toward oncoming traffic, all the while upsetting Lopez (T. 454-54).  Lopez told petitioner he was "fucking crazy" and petitioner responded "come on, we're going to have a little fun and we run from cops, so if we see them, we're running" (T. 454).

Petitioner parked outside Club Westchester and again insisted that Lopez drink

-23-

the "Incredible Hulk" but she again refused (T. 451).  This time, however, petitioner placed the bottle to Lopez's lips and tried to pour it into her mouth, and insisted she drink before they went into the club (T. 451).  For the third time, Lopez told petitioner she was not drinking that evening (T. 451).  Petitioner grabbed the back of Lopez's hair and tried to forcibly kiss her (T. 451, 631).  Using both hands, Lopez pushed petitioner away from her face and told him not to kiss her like that (T. 452-53).  Petitioner stopped but said "you know you like it rough" (T. 452, 632).  Lopez assured him that she did not; petitioner said "let's go in the club" (T. 452).  Lopez believed she had "checked" petitioner so she went into the club with him (T. 452, 632).  They walked in and Lopez stood around while petitioner talked to "some guy" for fifteen minutes, and then they walked out (T. 454).

Petitioner drove them to "Colosseo DiRoma" (T. 455).  Immediately upon entering the club (at approximately 12:30 a.m.), petitioner introduced Lopez to "Omar" (T. 455-56).  Lopez and Omar started talking and Omar ordered Lopez a "Hypnotic," which she declined to drink (T. 455-56).  Petitioner went off by himself in the club, leaving Lopez and Omar at the bar (T. 457).  When petitioner returned to them, Lopez went to the bathroom and then told petitioner she was ready to leave (T. 457).  Petitioner noticed Lopez was not drinking and reprimanded her for being rude (T. 457-58).  To be polite, Lopez took a sip of the drink; petitioner finished it off and the three of them (petitioner, Lopez and Omar) walked out of the club (T. 458).

They walked next door to Sue's Rendezvous, where security recognized petitioner and allowed all three entry without a security check or cover charge (T. 458-59).  Petitioner immediately went off by himself; Omar ordered Lopez a "Hypnotic,"

-24-

which she again refused to drink (T. 460).  While she and Omar talked, Lopez observed

petitioner milling around the club and noticed several of the strippers hug and kiss

petitioner (T. 460-61, 633).  Petitioner rejoined Lopez and Omar about thirty-five

minutes later, at which point Lopez stated she was ready to go home (T. 461-64).

Petitioner ignored her and told her to stand up and turn around for Omar; Lopez refused

(T. 464).  Petitioner asked Omar if he was ready to leave and the two of them walked

out of the club; Lopez followed (T. 465).

      As they walked out of the club, petitioner chided Omar for something and then

said to Lopez "you're getting on my fucking nerves too" and threw her car keys to her

(T. 465-66).  Lopez ran across the street to her car and got into the driver's seat (T.

466).  As she attempted to close the door, petitioner blocked it and asked where she

was going; Lopez told him she was going home (T. 466).  Petitioner told her to move

over, that she still had to take him to his car and then she could go home (T. 466).

Lopez slid over into the passenger seat and petitioner got into the driver's seat; Omar

got into the backseat (T. 466-68).  Petitioner drove up the block to "Tiny's" where they

dropped off Omar (T. 469-70).[12]

      In an attempt to get away from petitioner, Lopez told him to take her to a

bathroom (T. 475-478).  As they drove, petitioner said "I'm gonna tear you up, I'm gonna

take you to my house, I'm gonna take pictures of you" and "we're gonna make a movie"

(T. 478-80).  Fearful that petitioner intended to rape her, Lopez told him she had her

---

    [12] Count 1 (sodomy) and Count 4 (sexual abuse) arose from Lopez's allegations
that, immediately after dropping off Omar, petitioner drove around the corner, parked
the vehicle and sodomized and sexually abused Lopez.  The jury acquitted petitioner of
said charges.

period (T. 480, 732, 753-54).  Petitioner parked the car in a dark, wooded area along

Esplanade in Mount Vernon (T. 478, 752).  They both got out of the car; petitioner

hovered over Lopez (preventing her from running away) and told her she would have to

urinate there, over a sewer (T. 479, 485-86, 753).  When Lopez refused to urinate

outside, petitioner undid her pants and pulled them down to her knees (T. 479, 485).

Petitioner "smacked" Lopez open-handed on the left side of her face and said "You're a

fucking liar.  You don't have your period" (T. 479, 481, 485).  Desperate to get to a

public place and away from petitioner, Lopez told him to take her to a McDonald's

bathroom and she got back into the car (T. 481-82).

Petitioner, in the driver's seat, grabbed Lopez by the hair at the back of her head

and told her to "suck my dick again" (T. 482).  Lopez tried to resist by pushing back

against his leg, but petitioner pulled her head down (near the steering wheel) and forced

her mouth onto his flaccid penis (T. 482, 527-29).  Lopez could not tell where they were

driving until petitioner let her up and she saw a Getty gas station (T. 483).  Hoping for a

chance to get away, Lopez told petitioner to pull into the gas station because she had to

use the bathroom (T. 483, 487).  Petitioner pulled into the station and Lopez got out of

the car, went into the bathroom, locked the door and called 911 (T. 488-90).  Lopez told

the operator that she was in a Getty gas station in Mount Vernon and asked her to

"please, just help me, help me.  Hurry, he's beating me. Get someone over here fast"

(T. 489, 755).[13]  Lopez terminated the call when petitioner started banging on the door,

---

[13] The 911 operator (Sheila Hilton) testified that, at approximately 2:37 a.m. on
March 15, 2003, she received a "high-priority 911 call" from an upset, very distressed
female who said she was at the Getty service station in Mount Vernon and had been
assaulted (T. 389-91).

asking what she was doing and telling her to hurry up (T. 489-90).  Lopez tried to stall

as petitioner continued to bang on the door but, because she was worried that the

police would not find her if she stayed in the bathroom, she opened the door (T. 490-

92).[14]

A few minutes later, petitioner asked Lopez if she wanted something to drink; she

said yes and they walked into the Getty Mart (T. 495-96).  Petitioner stalled for time in

the mini-mart until she saw the police outside and ran to the officer (T. 497-98).  Lopez

said "get him away from me" and "he's hitting me and he made me suck his dick" (T.

498).[15]

Lopez was interviewed at the police station, where she noticed that hair in the

back of her head was coming out in "globs" as she ran her fingers through it (T. 513-14).

After Lopez gave her statement, a detective drove her to Mount Vernon Hospital where

she was seen by a triage nurse, a doctor and a "SANE" nurse (T. 514-16).

_____

[14] Count 3 (sodomy) arose from Lopez's allegations that petitioner sodomized her for a third time in the bathroom.  The jury acquitted petitioner of this charge.

[15] Police Officer Leli testified that, as he approached the front of the mini-mart, he observed a man and a woman by the counter (T. 317).  As the officer approached the front door, the man exited first with the woman behind him (T. 317).  The woman (identified as Lopez) looked panicked and jumped out from behind the man (identified as petitioner), positioned herself behind the officer (putting him between Lopez and petitioner) and said "help me, he's been hitting me, keep him away from me" (T. 317-18, 322).  Lopez was very upset and began crying (T. 319, 322).
 Detective Sergeant Hackett testified that he arrived at the Getty station at approximately 2:38 a.m. on March 15, 2003 and observed that Lopez was upset and crying (T. 496-97).
 The police recovered the alcohol and juice bottle containing the "Incredible Hulk" mixture from Lopez's vehicle (T. 330-31, 383, 508-09, 592).  The police determined that the alcohol did not belong to Lopez and that she was not intoxicated, and asked her to drive her vehicle and follow them to the police station (T. 329, 369-71, 401, 417-18, 420, 507-09).

The evidence recounted above sufficed to permit the jury to conclude that petitioner was guilty of using physical force to intentionally compel Lopez's mouth onto his penis while he and Lopez were in a car on March 15, 2003.  Thus, considering the evidence in the light most favorable to the prosecution, the court cannot conclude that no rational trier of fact could have found proof of petitioner's guilt beyond a reasonable doubt.  See Taylor v. Rivera, No. 07 Civ. 8668, 2011 WL 4471919, at *25 (S.D.N.Y. Apr. 18, 2011) ("The testimony of a single uncorroborated witness is sufficient to achieve a showing of guilt beyond a reasonable doubt even if that witness's testimony is less than entirely consistent.") (quotation and citation omitted).  Further, petitioner fails to establish that the Appellate Division's denial of his insufficient evidence claim was either contrary to, or involved an unreasonable application of, clearly established Federal law.  Accordingly, I conclude, and respectfully recommend, that petitioner's insufficient evidence claim is without merit and must be dismissed.

## VII. CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend, that the instant petition for a writ of habeas corpus be denied in its entirety.[16]

---

[16] Attached to this Report and Recommendation are copies of all unpublished opinions and decisions available only in electronic form cited herein.  See Lebron v. Sanders, 557 F.3d 76, 78 (2d Cir. 2009).

## VII.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(c), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from receipt of this Report to serve and file written objections to this Report and Recommendation.  If copies of this Report are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of this Report to file and serve written objections.  See Fed. R. Civ. P. 6(d).  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Edgardo Ramos at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to the Honorable Edgardo Ramos and not to the undersigned.

Dated:  May 29, 2013
        White Plains, New York

Respectfully Submitted,

GEORGE A. YANTHIS, U.S.M.J.

-29-